**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

TREVON DESHON CHAPMAN, SR.,

                Plaintiff,

     v.

ERIC WATSON; RYAN SULLIVAN; and
DEANNA MOSLEY OSBORNE,

                Defendant.

CIVIL ACTION NO.: 2:19-cv-33

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants Ryan Sullivan and Eric Watson's Motion for Summary Judgment, doc. 52, and Defendant Deana Mosley Osborne's Motion for Summary Judgment, doc. 55.  Plaintiff filed a Response, opposing both Motions for Summary Judgment. Doc. 65.  Defendants filed Replies.  Docs. 68, 69.  For the following reasons, I **RECOMMEND** the Court **GRANT** Defendants' Motions for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

## PROCEDURAL HISTORY

Plaintiff brought this 42 U.S.C. § 1983 action relating to his arrest and incarceration at Camden County Safety Complex.  Doc. 1.  After conducting frivolity review, the Court dismissed Plaintiff's claims against Defendants Procter and Mastroianni.  Doc. 18.  However, the Court permitted Plaintiff to proceed with his retaliation claim against Defendant Watson, his Fourth Amendment search and seizure claim against Defendant Sullivan, and his deliberate indifference to serious medical needs claim against Defendant Osborne.  Id.

Plaintiff alleges Defendant Sullivan illegally arrested him on May 7, 2017.  Doc. 1 at 5. Additionally, Plaintiff claims Defendant Sullivan illegally searched and seized Plaintiff's vehicle, violating his Fourth Amendment rights.  Id. at 3.  Upon Plaintiff's arrival at Camden County Public Safety Complex, he contends Defendant Osborne was deliberately indifferent to his broken clavicle and scapula when she confiscated his arm sling and by refusing to provide Plaintiff with his prescribed medication.  Id. at 5, 7.  When Plaintiff tried to file a grievance relating to the confiscation of his sling, Defendant Watson placed him on "lockdown," further violating his constitutional rights.  Id. at 7.

## UNDISPUTED MATERIAL FACTS

Local Rule 56.1 of the Southern District of Georgia provides a party moving for summary judgment must include "a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof."  Local R. 56.1.  Defendants submitted Statements of Material Fact in support of their respective Motions for Summary Judgment, in accordance with the Federal Rules of Civil Procedure and Local Rule 56.1.  Docs. 52-1, 55-1.

Defendants Sullivan and Watson's Statement of Material Facts ("SMF") relies on: affidavits from Defendants; Camden County Sherriff's Office Case Report from Plaintiff's arrest; video footage from Defendant Sullivan's vehicle;[1] Camden County Sherriff's Office

---

[1]    Defendants provided two videos from Defendant Sullivan's vehicle.  One video was recorded by a dashboard camera mounted in Defendant Sullivan's vehicle, and, therefore, is roughly from the perspective of an individual sitting the front seat of the vehicle.  The second video was recorded by a camera mounted in the ceiling of Defendant Sullivan's vehicle and captures events that occurred in the back seat of the vehicle.  The second video depicts Plaintiff seated in the back seat.  Both videos include audio.  The dashboard camera video begins recording before Defendant Sullivan even arrives at the scene and continues recording for approximately one hour and seventeen minutes.  The backseat camera video begins recording approximately seventeen minutes and fifteen seconds after the dashboard camera video begins and continues recording for approximately one hour.  Thus, the two videos overlap—in terms of

Policies on Vehicle Searches and on Transport of Sick or Injured Prisoners; Camden County Jail

Policy on: Pre-Admission Procedures, Booking Checklist, Orientation, Crimes within the

Facility, Administrative Separation, Disciplinary Separation, and Grievance System; an Inmate

Housing History Report for 2017; Disciplinary Records related to Plaintiff; Inmate Grievance

Detail Reports; Inmate Handbook; Medical Records; and certified records form Camden County

Probate Court.  Docs. 52-3 to 52-22.  Defendant Osborne's SMF relies on medical records and

her affidavit.  Docs. 55-3, 55-4.

Plaintiff filed a single Response to both Motions for Summary Judgment.  Doc. 65.

Plaintiff's Response includes an affidavit, sworn under penalty of perjury, in place of his

statement of material facts.  Doc. 65.  Plaintiff's affidavit contains no citations to the record.

Because Plaintiff did not satisfy Local Rule 56.1 by filing a response to Defendants' Statements

of Material Facts, all facts proffered by Defendants that have evidentiary support in the record

are deemed admitted.  See Local R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438

F. App'x 848, 849–50 (11th Cir. 2011) (finding no error in deeming defendants' material facts

admitted where pro se prisoner failed to respond with specific citations to evidence and

otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372,

1373 n.1 (S.D. Ga. 2000) (finding, under Local Rule 56.1 and Eleventh Circuit precedent, "all

unopposed fact statements supported by the evidentiary materials of record are deemed

admitted").

However, the Court considers at summary judgment the factual statements made with

specificity in Plaintiff's affidavit based on Plaintiff's first-hand knowledge because Plaintiff

attested them to be true under penalty of perjury.  See 28 U.S.C. § 1746; Fed. R. Civ. P. 56(e);

---

the timeline—for approximately one hour, capturing the same events from different viewpoints.  The
Court has reviewed both videos in their entirety.

United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1444 (11th Cir. 1991).  Nonetheless, "[u]nsupported, conclusory allegations that a plaintiff suffered a constitutionally cognizant injury are insufficient to withstand a motion for summary judgment."  Howard v. Memnon, 572 F. App'x 692, 695 (11th Cir. 2014) (citing Bennett v. Parker, 898 F.2d 1530, 1532–34 (11th Cir. 1990)).  The Court also considers Plaintiff's arguments in his Brief in Support of his Response and Objections to Defendants' Motions for Summary Judgment.  Doc. 65-1.

Additionally, when considering the record at summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) (internal punctuation omitted) (quoting Tolan v. Cotton, 572 U.S. 650, 651 (2014)).  But in cases with a video in evidence, the Court "'view[s] the facts in the light depicted by the videotape.'"  Shaw, 884 F.3d at 1098 (quoting Scott v. Harris, 550 U.S. 372, 380–81 (2007)).  As noted below, much of Plaintiff's affidavit is plainly contradicted by the video and, thus, is excluded from the Court's consideration.

In light of these circumstances, and after reviewing the parties' submissions, the Court identifies the following undisputed, material facts for the purposes of evaluating Defendants' Motions for Summary Judgment:

I.      **Plaintiff's Arrest and Search and Seizure of his Vehicle**

On May 7, 2017, Defendant Sullivan, a deputy sheriff with the Camden County Sheriff's Office, responded to a call from the Kingsland Police Department to be on the lookout for a green 1994 Ford Mustang with chrome rims and California registration because of a suspected child kidnapping.  Doc. 52-1 at 2; Doc. 52-3 at 1–2; Doc. 52-5.  Defendant Sullivan located the vehicle at the Georgia Hotel/Motel parking lot on Highway 17 in Kingsland, Georgia.  Doc. 52-1 at 2; Doc. 52-3 at 2; Doc. 52-5 at 1, 6; Doc. 52-6 at 00:20–00:31; Doc. 65 at 1.  When Defendant

Sullivan arrived, the car was parked and Plaintiff was standing next to the vehicle while a woman, later identified as the child's mother, was removing the child from the vehicle. Doc. 52-1 at 2; Doc. 52-3 at 2–3; Doc. 52-6 at 00:20–00:40; Doc. 65 at 1. Based on Defendant Sullivan's experience with domestic and child custody disputes, he was concerned about any potential conflict escalating and becoming violent. Doc. 52-1 at 2; Doc. 52-3 at 3. Defendant Sullivan acted consistently with Camden County Sheriff's Office procedure by securing Plaintiff with handcuffs behind his back while investigating the potential kidnapping. Doc. 52-1 at 2; Doc. 52-3 at 3; Doc. 52-6 at 0:48–1:28; Doc. 65 at 1. Further, while handcuffing Plaintiff, Defendant Sullivan did not observe Plaintiff wearing an arm sling or exhibiting any signs of visible injuries, and Plaintiff did not report any pain or discomfort to Defendant Sullivan.[2] Doc. 52-1 at 3; Doc. 52-3 at 3; Doc. 52-6 at 00:48–4:00.

After securing Plaintiff, Defendant Sullivan performed a search of Plaintiff's pockets and clothing. Doc. 52-1 at 3; Doc. 52-3 at 3; Doc. 52-6 at 1:24–3:47; Doc. 65 at 1. Defendant Sullivan detected the odor of marijuana when searching Plaintiff. Doc. 52-1 at 3; Doc. 52-3 at 3; Doc. 52-6 at 7:50–8:00; Doc. 65 at 1. Then, Defendant Sullivan placed Plaintiff in the back of his police vehicle, advising him he was being detained for possible kidnapping and explaining to Plaintiff he was waiting for investigators to arrive.[3] Doc. 52-1 at 3; Doc. 52-3 at 3–4; Doc. 52-6 at 3:48–4:42. After Defendant Sullivan finished addressing Plaintiff, Plaintiff asked Defendant Sullivan to go to his vehicle and get his wallet, as it contained information related to ongoing

---

[2]    Though Plaintiff contends he was wearing a sling when Defendant Sullivan approached him, doc. 65 at 1, the video flatly contradicts Plaintiff's assertion. Thus, viewing the facts in the light as portrayed by the video, the Court finds Plaintiff was not wearing a sling when Defendant Sullivan located and handcuffed him. Shaw, 884 F.3d at 1098.

[3]    Plaintiff asserts Defendant Sullivan did not inform him as to why he was being detained. Doc. 65 at 1. However, video plainly contradicts this contention, as well.

child custody disputes between Plaintiff and the child's mother.[4]  Doc. 52-1 at 4; Doc. 52-3 at 4;

Doc. 52-6 at 4:18–4:30.  During this conversation, Defendant Sullivan also advised Plaintiff to

avoid making statements that may incriminate himself and again reiterated investigators were on

their way.  Doc. 52-1 at 3; Doc. 52-3 at 3–4; Doc. 52-6 at 4:30–6:36.

Shortly thereafter, two other officers from the Sheriff's Office arrived, Corporal L.

Bowen and Sergeant S. Billington, to assist with the kidnapping investigation.  Doc. 52-2 at 4;

Doc. 52-3 at 4; Doc. 52-6 at 7:02.  After the other officers arrived, Defendant Sullivan called in

to the dispatcher the license plate of Plaintiff's vehicle and attempted to run it through the

National Crime Information Center and Georgia Crime Information Center (NCIC/GCIC)

databases, which are databases concerning warrants, stolen vehicles, licensing, and registration.

Doc. 52-1 at 4; Doc. 52-3 at 4; Doc. 52-6 at 7:06–7:26.  However, unbeknownst to Defendant

Sullivan and Plaintiff, the databases were not working.  Doc. 52-1 at 4; Doc. 52-3 at 4; Doc. 52-6

at 10:20–10:28.  Plaintiff then informed Defendant Sullivan his registration was expired.

Doc. 52-1 at 4; Doc. 52-3 at 4; Doc. 52-6 at 7:25–7:49.  At this point, Defendant Sullivan went to

Plaintiff's car and retrieved his wallet, per Plaintiff's earlier request.  Doc. 52-1 at 4; Doc. 52-3

at 4; Doc. 52-6 at 8:02–8:33.  When retrieving Plaintiff's wallet, the officers identified rolling

papers in his wallet.  Doc. 52-1 at 4; Doc. 52-3 at 3; Doc. 52-6 at 6:00–9:00.  The officers

continued their investigation by interviewing the child's mother, as Plaintiff remained

handcuffed in the police vehicle.  Doc. 52-1 at 5; Doc. 52-6 at 8:34–16:20.  The child's mother

informed Defendant Sullivan she saw Plaintiff driving and that Plaintiff did not have a driver's

license.  Doc. 52-1 at 5; Doc. 52-6 at 10:40–10:55.

---

[4]       Again, Plaintiff's statement he did not ask Defendant Sullivan to retrieve his wallet is
contradicted by the video evidence.  Doc. 65 at 1.  The video, as cited above, depicts Plaintiff asking
Defendant Sullivan to get his wallet from his car for information about the alleged kidnapping and
ongoing custody dispute.

A short while later, Detective King, who arrived at the scene to investigate the potential kidnapping, spoke with Plaintiff.  Doc. 52-1 at 6; Doc. 52-3 at 4; Doc. 52-6 at 16:21–18:42.  During this conversation with Detective King, Plaintiff informed him he had recently been in a car accident and the handcuffs were causing Plaintiff pain; however, Defendant Sullivan was not present for this conversation.  Doc. 52-1 at 5; Doc. 52-3 at 5; Doc. 52-6 at 16:52–17:04.  Detective King continued interviewing Plaintiff but removed his handcuffs.  Doc. 52-1 at 5; Doc. 52-3 at 5; Doc. 52-6 at 19:15–19:24, 19:15–31:45; Doc. 52-7 at 1:46–2:11.  After Detective King and Plaintiff finished speaking, Plaintiff remained uncuffed in the police vehicle.  Doc. 52-1 at 6; Doc. 52-3 at 6; Doc. 52-7 at 14:31–14:58.

While Detective King was speaking with Plaintiff, Defendant Sullivan received information about Plaintiff's vehicle registration and license, learning Plaintiff's license was suspended and the vehicle was not registered.  Doc. 52-1 at 5; Doc. 52-3 at 5; Doc. 52-6 at 18:40–19:00, 20:22–20:45, 24:45–24:55, 26:05–26:22.  Defendant Sullivan elected to arrest Plaintiff for driving on a suspended license and expired registration and other traffic-related charges.[5]  Doc. 52-1 at 6, 7; Doc. 52-3 at 6; Doc. 52-6 at 21:20–21:29, 32:37–32:28.  Defendant Sullivan believed he had probable cause to arrest Plaintiff.  Doc. 52-1 at 5–6; Doc. 52-3 at 6.  Because of the location of Plaintiff's vehicle and Defendant Sullivan's decision to arrest Plaintiff, Defendant Sullivan was authorized under the Camden County Sheriff's Office Policy to impound and search the vehicle.  Doc. 52-1 at 6; Doc. 52-3 at 5; Doc. 52-6 at 00:28–00:40; Doc. 52-5 at 3; Doc. 52-8.  Officers, including Defendant Sullivan, performed a search of Plaintiff's vehicle based on the decision to arrest Plaintiff and the need to impound the vehicle.

---

[5]     Detective King elected not to arrest Plaintiff on charges concerning any potential kidnapping. Doc. 52-1 at 7; Doc. 52-3 at 6; Doc. 52-6 at 32:30–32:58.

Doc. 52-1 at 6; Doc. 52-3 at 6; Doc. 52-5 at 3; Doc. 52-6 at 27:40–38:11; Doc. 65 at 1.  During

this inventory search, Defendant Sullivan observed the vehicle's rearview mirror was obscured

and the vehicle lacked side-view mirrors.  Doc. 52-1 at 6; Doc. 52-3 at 5; Doc. 52-5 at 4.

Detective King relayed information about Plaintiff's injuries to Defendant Sullivan

following his interview with Plaintiff.  Doc. 52-1 at 7; Doc. 52-3 at 7; Doc. 52-6 at 31:50–32:05;

Doc. 52-7 at 14:47–14:57.  Based on this information, Defendant Sullivan re-cuffed Plaintiff

with his hands in front of his body because that position puts less stress on a person's shoulders.

Doc. 52-3 at 6; Doc. 52-6 at 31:56–32:28; Doc. 52-7 at 14:59–15:17.  This decision was

consistent with the Sheriff's Office's Policy on Handicapped and Physically Impaired Prisoners.

Doc. 52-1 at 7; Doc. 52-3 at 6; Doc. 52-9.  Plaintiff did not indicate to Defendant Sullivan this

position caused him any pain.  Doc. 52-1 at 7; Doc. 52-3 at 6; Doc. 52-7 at 14:59–15:22.

Detective Sullivan remained at the scene with Plaintiff until the towing company arrived and the

car was impounded.  Doc. 52-1 at 8; Doc. 52-3 at 7.  After Plaintiff's vehicle was impounded,

Defendant Sullivan took Plaintiff to the Camden County Jail.  Doc. 52-1 at 8; Doc. 52-3 at 7.

## II.    Plaintiff's Detention at Camden County Detention Center

Plaintiff was held at Camden County Detention Center as a pre-trial detainee following

his arrest.  Doc. 52-1 at 1; Doc. 52-5.  When Plaintiff arrived at Camden County Detention

Center on May 7, 2017, he received a Health Appraisal, which was conducted by Defendant

Osborne.  Doc. 52-1 at 2; Doc. 55-4 at 2.  All detainees receive a Health Appraisal upon arriving

at Camden County Detention Center where a medical professional determined whether a

detainee should remain in custody or be referred to Camden County Medical Center.  Doc. 52-1

at 8; Doc. 52-4 at 3.  Defendant Osborne, a licensed nurse practitioner ("LPN"), documented

Plaintiff's injuries from a car accident on or about April 14, 2017, including a broken left collar

bone, a broken left shoulder blade, and multiple broken ribs. Doc. 55-1 at 8; Doc. 55-3 at 3–5; Doc. 55-4 at 1. Additionally, Defendant Osborne observed Plaintiff had sustained a collapsed lung during the accident, which required him to have a chest tube inserted, and had two sutures on his left side from where the tube had been inserted. Doc. 55-2 at 2; Doc. 55-3 at 3–5. Defendant Osborne noted Plaintiff's medication, which included: Neurontin (unknown dosage, unknown frequency); ibuprofen (800mg, unknown frequency); Colace (100mg, unknown frequency); Tylenol #2 (unknown dosage, unknown frequency); and Flexeril (5mg, unknown frequency). Doc. 55-1 at 2; Doc. 55-3 at 3–5. Plaintiff did not provide prescriptions for his medications during the Health Appraisal, and Defendant Osborn, as an LPN, is not legally permitted to write prescriptions. Doc. 55-1 at 2; Doc. 55-4 at 2–3. However, Defendant Osborne recommended Plaintiff be seen by a qualified medical provided to receive further treatment for his injuries and obtain his prescriptions. Doc. 55-4 at 3; Doc. 55-3 at 4. Further, Defendant Osborne recommended Plaintiff be placed in a medical holding cell. Doc. 55-4 at 3. The Health Appraisal on May 7, 2017, was the only time Defendant Osborne interacted with Plaintiff in the context of providing him medical treatment. Doc. 55-4 at 2.

Additionally, during Plaintiff's arrival he was booked, including having his photo taken. Doc. 52-1 at 9. During booking is when Defendant Watson first encountered Plaintiff. Doc. 52-1 9; Doc. 52-4 at 3. Following intake, Plaintiff was housed in a holding block from May 7 to May 11, 2017. Doc. 52-1; Doc. 52-4 at 3; Doc. 52-17 at 1; Doc. 65 at 2. On May 11, 2017, Defendant Watson transferred Plaintiff to cell M8 in the medical block out of concern over Plaintiff's medical condition. Doc. 52-1 at 9; Doc. 52-4 at 3; Doc. 52-17 at 1; Doc. 65 at 2.

On May 11, 2017, Defendant Watson overhead Plaintiff speaking rudely and disrespectfully to the on-duty medical staff, including using profanity toward a nurse. Doc. 52-1

9

at 9; Doc. 52-4 at 3–4; Doc. 52-18 at 2; Doc. 52-19 at 4; Doc. 65 at 2.  Defendant Watson then

approached Plaintiff.  He first observed several grievance envelopes sticking through the cell

door, violating facility rules, and then explained to Plaintiff his use of language toward staff and

disrespectful behavior were not acceptable.  Doc. 52-1 at 10; Doc. 52-4 at 4; Doc. 52-18 at 2;

Doc. 52-19 at 4; Doc. 65 at 2.  During Defendant Watson's conversation with Plaintiff, Plaintiff

stated he had not yet started to act inappropriately, which Defendant Watson considered a threat

and a serious violation under the jail's disciplinary rules.  Doc. 52-1 at 10; Doc. 52-4 at 4;

Doc. 52-15 at 2; Doc. 52-18 at 2; Doc. 52-19 at 4; Doc. 65 at 2.

     As a result of Plaintiff's behavior toward staff and Defendant Watson's assessment

Plaintiff was threatening him, Defendant Watson placed Plaintiff on administrative separation

pending disciplinary court (DR), which is consistent with the jail's Administrative Separation

policy.  Doc. 52-1 at 10; Doc. 52-4 at 4; Doc. 52-14 at 1; Doc. 65 at 2.  Defendant Watson did

not change Plaintiff's cell location due to Plaintiff's reported injuries.  In administrative

separation, Plaintiff received a loaf for meals and lost certain privileges.  Doc. 52-1 at 10;

Doc. 52-4 at 3; Doc. 65 at 2.  Plaintiff was charged with disciplinary violation for profanity and

disrespect, abusing and disrupting services, threats, and disorderly conduct, but Plaintiff was not

punished for anything related to the grievances.  Doc. 52-1 at 11; Doc. 52-4 at 4; Doc. 52-18 at

2; Doc. 65 at 2.

## DISCUSSION

### I.   Legal Standard

     Summary judgment "shall" be granted if "the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  "A dispute about a material fact is genuine and summary judgment is

inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, there must exist a conflict in substantial evidence to pose a jury question."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).  "If the evidence [produced by the nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249 (1986) (citations omitted).

The moving party bears the burden of establishing there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law.  See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)).  Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the non-moving party to come forward with specific facts showing a genuine dispute for trial.  Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2019).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011).

## II.   Plaintiff's Fourth Amendment Claims Against Defendant Sullivan

Plaintiff brings three Fourth Amendment claims against Defendant Sullivan.  Doc. 1 at 3.

First, Plaintiff contends Defendant Sullivan did not have probable cause to arrest him.  Next,

Plaintiff alleges Defendant Sullivan used excessive force when handcuffing him.  Id. at 7.

Finally, Plaintiff argues Defendant Sullivan's search and seizure of his vehicle violated his

Fourth Amendment rights.  Id. at 3, 7.

Defendant Sullivan asserts he is entitled to qualified immunity and, therefore, summary

judgment on all three claims, because he did not violate Plaintiff's constitutional rights.  Doc. 52

at 12.  Plaintiff opposes Defendant Sullivan's Motion for Summary Judgment.  Doc. 65.

"Qualified immunity protects government officials performing discretionary functions

from suits in their individual capacities unless their conduct violates 'clearly established statutory

or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno,

334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  For

qualified immunity to apply, the official must establish "he was acting within the scope of his

discretionary authority when the allegedly wrongful acts occurred."  McCullough v. Antolini,

559 F.3d 1201, 1205 (11th Cir. 2009) (citation omitted).  If the official shows he was acting

within the scope of his discretionary authority, then the burden shifts to the plaintiff to "show

that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at

the time of the alleged violation."  Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)

(quoting Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)).

As an initial matter, Defendant Sullivan was acting within his discretionary authority

when he detained, investigated, and arrested Plaintiff, and Plaintiff has not argued otherwise.

Thus, the remainder of the analysis focuses on whether Defendant Sullivan violated any of

Plaintiff's constitutional rights and, if necessary, whether the right was clearly established at the time of the alleged violation.

### A.      False Arrest

Plaintiff first complains Defendant Sullivan did not have probable cause to arrest him for the alleged traffic violations, and, thus, did so in violation of his constitutional rights.  Doc. 1 at 3, 7.  Defendant Sullivan, however, argues he is entitled to qualified immunity on this claim because he had probable cause or at least arguable probable cause to arrest Plaintiff for the alleged traffic violations and, therefore, did not violate Plaintiff's constitutional rights.  Doc. 52 at 12.  Plaintiff, in his Response, argues Defendant Sullivan lacked probable because he did not witness Plaintiff operate the vehicle and instead relied on witness statements made up of hearsay and his own statements, which were obtained in violation of Plaintiff's Miranda rights.  Doc. 65-1 at 1.

#### *1.      Legal standard.*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  A "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  Brower v. County of Inyo, 489 U.S. 593, 596–97 (1989).  Generally, a seizure is reasonable if it is supported by probable cause.  Croom v. Balkwill, 645 F.3d 1240, 1246 (11th Cir. 2011) ("Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime.").  In fact, an arrest made with probable cause is "an absolute bar to a subsequent constitutional challenge to the arrest."  Gates v. Khokhar, 884 F.3d 1290, 1297 (11th Cir. 2018) (quoted source omitted).

"Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted); United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (stating probable cause to arrest exists when a law enforcement official has "facts and circumstances within [his] knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime"). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). Probable cause determinations are guided by reviewing the totality of the circumstances. Id. at 233.

In the context of a qualified immunity defense, all that is required of an arresting officer is "arguable probable cause to believe that a person is committing a particular public offense; that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiffs." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoted sources omitted); Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). The arguable probable cause standard is an objective one, and it recognizes an official may make a reasonable but mistaken judgment as to the existence of actual probable cause. See Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010). Therefore, whether arguable probable cause exists depends largely on the "information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." Jones, 174 F.3d at 1283 n.4. The ultimate inquiry as to whether an arresting officer possessed

arguable probable cause "depends on the elements of the alleged crime . . . and the operative fact pattern." Skop v. City of Atlanta, 485 F.3d 1130, 1137–38 (11th Cir. 2007).

### 2.     *Analysis of false arrest claim.*

Defendant Sullivan is entitled to qualified immunity on Plaintiff's claim of false arrest if arguable probable cause existed to arrest Plaintiff.  The relevant inquiry is whether a reasonable officer in the same circumstances and possessing the same knowledge as Defendant Sullivan could have believed probable cause existed to arrest Plaintiff.  Here, at least arguable probable cause existed to arrest Plaintiff for driving on a suspended license.

Under Georgia law:

> Any person who drives a motor vehicle on any public highway of this state without being licensed as required by subsection (a) of Code Section 40-5-20 or at a time when his or her privilege to so drive is suspended, disqualified, or revoked shall be guilty of a misdemeanor for a first conviction thereof . . . .

O.C.G.A. § 40-5-121(a).  "Georgia law permits law enforcement officers to arrest persons for driving on a suspended license."  Robinson v. McNeese, No. 5:20-cv-160, 2021 WL 767864, at *8 (M.D. Ga. Feb. 26, 2021) (quoting Maines v. Spalding Cnty. Police Dep't, No. 3:17-CV-0159, 2017 WL 10431617, at *2 (N.D. Ga. Dec. 4, 2017)).  Additionally, O.C.G.A. § 17-4-20(a)(2)(A) permits an officer to arrest a suspect without a warrant if the officer has immediate knowledge of a crime.

Given the relevant Georgia statutes, the undersigned now examines whether Defendant Sullivan had any form of probable cause to arrest Plaintiff on May 7, 2017.  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)).  Therefore, the analysis focuses only on the facts known to Defendant Sullivan at the time of the arrest.

The undisputed material facts show Defendant Sullivan received a dispatch report stating Plaintiff had taken his child from the child's mother and was driving around with the child in a green Ford Mustang.  Doc. 52-1 at 2; Doc. 52-3 at 1–2; Doc. 52-5.  When Defendant Sullivan identified Plaintiff, the suspect, he was standing next to his vehicle (which matched the description in the dispatch report) in a parking lot with the child and child's mother.  Doc. 52-1 at 2; Doc. 52-3 at 2–3; Doc. 52-6 at 00:20–00:40; Doc. 65 at 1.  Plaintiff admitted to driving the vehicle prior to Defendant Sullivan's arrival, and the child's mother reported she saw Plaintiff driving and Plaintiff did not have a license.  Doc. 52-1 at 5; Doc. 52-6 at 7:25–7:49; Doc. 52-6 at 10:40–10:55.  Further, the results of the NCIC/GCIC search confirmed Plaintiff's license was suspended.  Doc. 52-1 at 5; Doc. 52-3 at 5; Doc. 52-6 at 18:40–19:00, 20:22–20:45, 24:45–24:55, 26:05–26:22; see Robinson, 2021 WL 767864, at *9 (collecting cases which establish probable cause exists for an arrest based on a suspended license when agencies such as GCIC or NCIC report a suspended license).

Plaintiff appears to argue his own statements about driving the vehicle and witness statements about him driving the vehicle cannot form the basis for Defendant Sullivan's probable cause because they were taken in violation of his Miranda rights and constitute hearsay. Doc. 65-1 at 1.  Plaintiff is incorrect.  Miranda rights derive from the Fifth Amendment right to be free from self-incrimination but do not impact whether an officer may rely on a suspect's statements to form probable cause for an arrest.[6]  See Brown v. Illinois, 422 U.S. 590, 601 n.6 (1975) ("The Miranda warnings in no way inform a person of his Fourth Amendment rights, including his right to be released from unlawful custody following an arrest made without a

---

[6]     The Court makes no determination as to whether Plaintiff's statements made to Defendant Sullivan were in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  Rather, even if they were in violation of Miranda, it would have no bearing on whether Defendant Sullivan had probable cause to arrest Plaintiff.

warrant or without probable cause.").  Likewise, under the Federal Rules of Evidence, hearsay statements may not be offered as testimony in court, absent an exception.  See Fed. R. Evid. 801(c).  However, officers may rely on hearsay, as Defendant Sullivan did here, in determining whether probable cause existed for an arrest when that hearsay is corroborated.  See Zargari v. United States, 658 F. App'x 501, 507 (11th Cir. 2016) (recognizing hearsay may support existence of probable cause); Johnson v. City of Warner Robins, No. 5:15-CV-419, 2018 WL 1095563, at *20, n.10 (M.D. Ga. Feb. 28, 2018) ("Police officers may base assessments of probable cause on hearsay and may seek arrest warrants on the basis of hearsay."); Lovelace v. United States, 357 F.2d 306, 311 (5th Cir. 1966) (citing Ker v. California, 374 U.S. 23, 36 (1963), and then citing Draper v. United States, 358 U.S. 307 (1959) (explaining the fact information is hearsay "does not destroy its role in establishing probable cause when reliable corroborative information is acquired")).  Additionally, any hearsay statements by the child's mother about Plaintiff's suspended license and his driving the car were corroborated by Plaintiff's own admissions, the GCIC/NCIC database report, and Defendant Sullivan's observations.

Thus, the Court finds Defendant Sullivan is entitled to qualified immunity on Plaintiff's false arrest claim, as Plaintiff's Fourth Amendment rights were not violated.  Defendant Sullivan was acting in his discretionary authority; he had at least arguable probable cause to believe Plaintiff had been driving on a suspended license, and because the suspected violation was within Defendant Sullivan's immediate knowledge, he was authorized by Georgia law to make a warrantless arrest.  Accordingly, I **RECOMMEND** the Court **GRANT** the portion of

Defendants' Motion for Summary Judgment related to Plaintiff's false arrest claims against Defendant Sullivan.[7]

### B.      Excessive Force

Plaintiff claims Defendant Sullivan used excessive force when he handcuffed Plaintiff behind Plaintiff's back even though Plaintiff was recovering from a broken shoulder blade and collar bone.  Doc. 1.  Any use of force claim during arrest, even handcuffing, is governed by the Fourth Amendment.  Doc. 52-2 at 14; Doc. 65-1 at 2.

Defendant Sullivan argues the amount of force he used when handcuffing Plaintiff was objectively reasonable under the Fourth Amendment's objective reasonableness standard, and, therefore, he did not violate Plaintiff's constitutional rights.  Doc. 52-2 at 15.  Defendant Sullivan contends, because he was not aware of Plaintiff's medical condition and because any resulting injury was minimal, his Motion should be granted.  Id.  That is, Defendant Sullivan argues he is entitled to qualified immunity and summary judgment because the undisputed material facts show he did not violate Plaintiff's constitutional rights.

Plaintiff, on the other hand, maintains Defendant Sullivan was aware of his injuries when he handcuffed Plaintiff's hands behind his back and his lack of complaints about pain do not relieve Defendant Sullivan of any legal liability.  Doc. 65-1 at 2.  Further, Plaintiff argues the situation was not so tense as to warrant handcuffs.  Id.

### 1.      Legal standard.

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof

---

[7]      Because the Court finds Defendant Sullivan had arguable probable cause to arrest Plaintiff for driving on a suspended license, the Court declines to address whether Defendant Sullivan had actual probable cause to arrest Plaintiff for driving on a suspended license and whether Defendant Sullivan had arguable or actual probable cause to arrest Plaintiff for Plaintiff's other alleged traffic violations.

to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).  However, any use of force must be reasonable, and "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force." Alvin v. Veal, CV417-206, 2020 WL 1061285 (S.D. Ga. Feb. 6, 2020) (quoting Scott v. Palmer, 210 F. Supp. 3d 1303, 1313 (N.D. Ala. 2016)).  "The reasonableness inquiry [asks] whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (internal quotations omitted).  To determine whether the amount of force used by Defendant Sullivan was proper, the Court must ask whether a reasonable officer would believe the level of force used was necessary under the circumstances. Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002).  Whether an officer's use of force was excessive or reasonable "is a 'pure question of law,' decided by the court." Stephens v. DeGiovanni, 852 F.3d 1298, 1321 (11th Cir. 2017) (quoting Myers v. Bowman, 713 F.3d 1319, 1328 (11th Cir. 2013)).

This inquiry requires courts to "slosh [their] way through the fact bound morass of 'reasonableness.'" Scott v. Harris, 550 U.S. 372, 383 (2007).  Consequently, a court must "look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009); see also Graham, 490 U.S. at 396 (Use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").  Additionally, a court must consider that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.

Generally, courts do not "second-guess the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003).

In analyzing the objective reasonableness of force, a court must initially determine whether the officer needed to apply force at all by applying the three non-exclusive Graham factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Stephens, 852 F.3d at 1321 (quoting Graham, 490 U.S. at 396). If force was indeed necessary, a court must then apply the Eleventh Circuit's three factors for determining whether the use of force was objectively reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Id. at 1324 (internal quotations omitted). This "fact-specific inquiry takes into account facts as they reasonably appeared to the police officer." Williams v. Deal, 659 F. App'x 580, 597–98 (11th Cir. 2016). Indeed, "[i]f an officer reasonably, but mistakenly, believes that one of the factors relevant to the merits of the constitutional excessive-force claim is present"—the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight—"the officer is justified in using more force than in fact was needed." Id. That is, even if the office incorrectly determines force was needed, so long as his belief was reasonable, the use of force will not amount to a constitutional violation.

### 2.   *Analysis of excessive force claim.*

Defendant Sullivan is entitled to qualified immunity on Plaintiff's excessive force claims because he was acting in his discretionary authority and did not violate Plaintiff's Fourth

Amendment rights.  The video of Defendant Sullivan's handcuffing of Plaintiff shows there was nothing gratuitous or excessive about the amount of force he used.

The first Graham factor, the severity of the crime at issue, weighs in favor of Defendant Sullivan.  Defendant Sullivan was investigating Plaintiff for potential kidnapping, undoubtedly a serious crime.  The second Graham factor likewise weighs in favor of Defendant Sullivan. Although the Court views the record and all reasonable inferences that can be drawn from the record in the light most favorable to Plaintiff, the Court evaluates those facts from the perspective of a reasonable officer on the scene to determine whether the force used was objectively reasonable.  Manners v. Cannella, 891 F.3d 959, 973 (11th Cir. 2018).  Though the video shows Plaintiff was largely cooperating with the investigation, Defendant Sullivan offered undisputed, sworn testimony that, based on his experience, domestic incidents often turn violent. Doc. 52-3 at 3; Doc. 52-6 at 00:50–1:27.  Further, the child and the child's mother were at the scene—a dilapidated motel—when Defendant Sullivan arrived.  Doc. 52-6 at 00:00–1:00.  Thus, a reasonable officer could find, based on the nature of the crime and those present at the scene, handcuffing Plaintiff was necessary for everyone's safety.

The third Graham factor, whether the suspect was actively resisting arrest or attempting to evade arrest, falls in favor of Plaintiff.  The video shows Plaintiff was compliant with Defendant Sullivan's orders and generally cooperative, and Defendant Sullivan does not argue Plaintiff was uncooperative.  Nonetheless, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.  The reasonableness inquiry "must embody allowance for the fact that police officers are often forced to make split-second judgments-in

21

circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."  Id. at 396–97.

Here, the undisputed material facts show Defendant Sullivan immediately handcuffed Plaintiff as soon as he arrived at the scene, based on the dispatch report and the fact Plaintiff, his nine-month old child, and the child's mother were all present.  Plaintiff was handcuffed and placed in the back of Defendant Sullivan's police vehicle while he waited for back-up and began investigating the potential kidnapping.  Doc. 52-1 at 3; Doc. 52-3 at 3; Doc. 56-2 at 00:50–1:27. No other force was applied to Plaintiff, nor does Plaintiff complain of any other use of force. Doc. 52-6 at 00:48–4:00.  Though Plaintiff argues Defendant Sullivan was aware of his injuries before he arrive at the scene based on the 911 call, Plaintiff admits he did not obtain the 911 call and, accordingly, has not offered it as evidence.  Doc. 65-1 at 1.  Further, the video evidence plainly contradicts Plaintiff's assertion he was wearing an arm sling when he encountered Defendant Sullivan, which might have alerted Defendant Sullivan to Plaintiff's physical injuries. Doc. 52-6 at 00:50–1:27.  Likewise, Plaintiff contends his child's mother put Defendant Sullivan on notice of his injuries such that a reasonable officer would know handcuffing Plaintiff behind his back would result in excessive force.  Doc. 65 at 2.  However, this contention is contradicted by the video.  The video shows a brief conversation between the child's mother and Defendant Sullivan where she explains Plaintiff was recently in the hospital, doc. 52-6 at 11:16–12:06, but the child's mother does not indicate specifically what Plaintiff's injuries were or provide other information that would alert a reasonable officer that handcuffing Plaintiff was inappropriate. Plaintiff also contends Defendant Sullivan was aware of his medical condition based on seeing his medical records when Defendant Sullivan performed an inventory search of Plaintiff's vehicle.  Doc. 65-1 at 1.  However, Plaintiff's contention about Defendant Sullivan's knowledge

22

of Plaintiff's medical records is not supported by any evidence in the record.  Further, Defendant

Sullivan handcuffed Plaintiff behind his back before ever searching Plaintiff's car and after

searching his vehicle, Plaintiff was placed in front cuffs.  Moreover, Defendant Sullivan did not

learn about Plaintiff's injuries or any potential physical harm he was inflicting upon Plaintiff

through their conversations.  That is, despite Defendant Sullivan speaking with Plaintiff for

several minutes, Plaintiff never indicates to Defendant Sullivan the handcuffing was causing him

any pain.  Doc. 52-4 at 00:50–6:18.

The totality of the circumstances demonstrates a reasonable officer would believe the

force Defendant Sullivan applied when handcuffing Plaintiff behind his back was not excessive.

Additionally, once Detective King alerted Defendant Sullivan to Plaintiff's injuries and

handcuffing Plaintiff behind his back was causing Plaintiff pain, Defendant Sullivan modified

his treatment of Plaintiff by front-cuffing him.  Doc. 52-3 at 6; Doc. 52-6 at 31:56–32:28;

Doc. 52-7 at 14:59–15:17.  Thus, the undisputed material facts show Defendant Sullivan was not

aware of Plaintiff's injuries when handcuffing Plaintiff behind his back, and when Defendant

Sullivan became aware of Plaintiff's conditions, he front-cuffed Plaintiff.  Furthermore, at the

time Defendant Sullivan arrived at the scene he was faced with investigating a serious crime

(kidnapping) while Plaintiff, his child, and the child's mother were all present.  Consequently, a

reasonable officer on the scene investigating a potential kidnapping, without any special

knowledge of Plaintiff's injuries, would believe the level of force Defendant Sullivan used—

handcuffing Plaintiff with his hands behind his back—was necessary under the circumstances.

Additionally, Plaintiff cannot sustain a use of force claim where the force was de minimis

and a result of painful handcuffing.  Sebastian v. Ortiz, 918 F.3d 1301, 1308 (11th Cir. 2019).

Specifically, the Eleventh Circuit Court of Appeals has held, "Painful handcuffing, without

more, is not excessive force in cases where the resulting injuries are minimal." Id. (citation omitted).  Here, Plaintiff has brought no evidence of injury other than the allegations of pain he experienced while being handcuff; such de minimis injury is not enough to support his claim. Id.; Rodriguez v. Farrell, 280 F.3d 1341, 1351–53 (11th Cir. 2002) (explaining common non-excessive handcuffing technique that resulted in severe injuries due to plaintiff's pre-existing injuries does not result in constitutional violation, where defendant had no knowledge of the pre-existing injury).

In sum, the Court finds Defendant Sullivan is entitled to qualified immunity.  Qualified immunity applies unless the application of the reasonable officer standard would "inevitably lead every reasonable officer to conclude the force was unlawful." Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000).  Even construing the evidence in a light most favorable to Plaintiff, the circumstances would not lead every reasonable officer to conclude the force used here was excessive and unlawful.  Finally, Plaintiff cannot sustain a claim based on de minimis injury resulting from painful handcuffing.

Accordingly, I **RECOMMEND** the Court **GRANT** Defendants' Motion for Summary Judgment on Plaintiff's excessive force claim against Defendant Sullivan.

C.     **Search and Seizure**

Plaintiff brings a Fourth Amendment claim against Defendant Sullivan for the search and seizure of Plaintiff's vehicle following his arrest.  Doc. 1.  Defendants argue Defendant Sullivan should be granted summary judgment because Defendant Sullivan was acting within his discretionary authority when he searched the vehicle and he had probable cause to search the vehicle due to the suspected presence of marijuana or as a valid inventory search.  Doc. 52 at 17. Plaintiff opposes summary judgment, arguing no probable cause existed because the search and

seizure did not result from a traffic stop, Plaintiff was not occupying the vehicle at the relevant time, the vehicle was not being used in the commission of a drug crime, and because the case against him was dismissed.  Doc. 65-1 at 1.

### 1.   Legal standard.

The Fourth Amendment establishes the constitutional right for individuals to be free from unreasonable searches and seizures.  "The Fourth Amendment generally requires police to secure a warrant before conducting a search."  Maryland v. Dyson, 527 U.S. 465, 466 (1999). However, searches of vehicles are, in certain circumstances, an established exception to the warrant requirement.  Id. at 466.  Under the "automobile exception," if (1) a car is "readily mobile and (2) probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits the police to search the vehicle without more."  Id. at 467.  Officers can search any container in an operational car without a warrant if they have probable cause to believe that the container holds evidence of a crime.  United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); California v. Acevedo, 500 U.S. 565, 579–80 (1991); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).

Another exception to the warrant requirement exists for inventory searches, conducted pursuant to an established procedure, on legally impounded vehicles.  South Dakota v. Opperman, 428 U.S. 364, 372–73 (1976).  This inventory search exception provides:

> Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity.  If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria.

Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (internal quotation marks omitted).

There are three interests that justify the inventory search exception: (1) "protection of the

owner's property which may be stored in the vehicle;" (2) "protection of the police from false

claims of lost possessions;" and (3) "protection of the police from potential danger." United

States v. Staller, 616 F.2d 1284, 1289 (5th Cir. 1980). "[I]f an inventory search is otherwise

reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other

evidence may be found." Id. at 1290.

### 2.    *Analysis of Plaintiff's search and seizure claim.*

Defendant Sullivan was acting within his discretionary authority and had probable cause

to search Plaintiff's vehicle based on Defendant Sullivan detecting marijuana and was permitted

to search Plaintiff's car pursuant to the Fourth Amendment's inventory-search exception.  When

Defendant Sullivan initially handcuffed Plaintiff, he avers he smelled marijuana.  Doc. 52-1 at 3;

Doc. 52-3 at 3.  Defendant Sullivan later relayed his suspicions about marijuana to Plaintiff,

telling Plaintiff he smelled marijuana on him and asking if the car contained any marijuana.

Doc. 52-1 at 3; Doc. 52-3 at 3; Doc. 52-6 at 7:50–8:00; Doc. 65 at 2; Doc. 65-1 at 1.  Though

Plaintiff denied having marijuana on video, he never disputes Defendant Sullivan smelled

marijuana on his person.  See Doc. 65 at 1.  That is, there is no genuine dispute that Defendant

Sullivan smelled marijuana.  Further, officers found rolling papers when retrieving Plaintiff's

wallet per Plaintiff's request, which in Defendant Sullivan's experience are commonly used with

marijuana and added to his probable cause to suspect Plaintiff possessed marijuana.  Doc. 52-1 at

4; Doc. 52-3 at 3; Doc. 52-6 at 6:00–9:00.  Accordingly, the undisputed material facts show

Defendant Sullivan detected the smell of marijuana and found rolling papers in Plaintiff's wallet,

located in the car, which provided him with probable cause to search the vehicle.  See United

States v. Smith, 596 F. App'x 804, 807 (11th Cir. 2015) (citations omitted) ("Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle.  Probable cause may arise when an officer, through training or experience, detects the smell of marijuana.").

Even assuming, *arguendo*, there is material dispute of fact as to whether Defendant Sullivan detected marijuana, Defendant Sullivan was still permitted to perform an inventory search of Plaintiff's car after Plaintiff was arrested according to Camden County Sheriff's Department policy.  Doc. 52-1 at 6; Doc. 52-3 at 5; Doc. 52-6 at 00:28–00:40; Doc. 52-5 at 3; Doc. 52-8.  Although Plaintiff asserts the search and seizure of his car is invalid because his charges were dismissed, doc. 65-1 at 1, the outcome of his criminal proceedings are not material to whether Defendant Sullivan was permitted to conduct an inventory search.  See, e.g., Brown v. Passmore, No. 09-20936-Civ, 2012 WL 12962921, at *2 (S.D. Fla. May 30, 2012) (citations omitted) ("That is, the ultimate disposition of the criminal charges is irrelevant to whether or not the search was lawful.").  Put succinctly, and as the Court explained above, probable cause existed to arrest Plaintiff and, therefore, his arrest and the seizure of his vehicle was constitutional.  Owens v. Turner, No. 5:15-CV-12, 2016 WL 5219461, at *6 (M.D. Ga. Sept. 21, 2016) (explaining an officer could impound Plaintiff's pursuant to police procedure because Defendant had probable cause to arrest Plaintiff).

While Plaintiff argues Defendant Sullivan was not required to impound his vehicle because it was on private property, he does not dispute Defendant Sullivan was permitted to impound his vehicle pursuant to department policy.  Doc. 65-1 at 1.  Case law confirms Defendant Sullivan was permitted to impound and search Plaintiff's vehicle under the Camden County Sheriff's Department policy.  Doc. 52-1 at 6; Doc. 52-3 at 5; Doc. 52-5 at 3; Doc. 52-8;

see Sammons, 967 F.2d at 1542 (explaining a law enforcement officer may impound a vehicle so long as the decision to impound is made based on standard criteria).  Moreover, Plaintiff has not presented any evidence the impoundment and inventory search were not performed according to standard procedure in these circumstances.  Therefore, the Court finds the inventory search of Plaintiff's vehicle was proper and did not violate Plaintiff's Fourth Amendment rights.  Accordingly, because Plaintiff's rights were not violated, Defendant Sullivan is entitled to summary judgment on this claim as well.

Based on the foregoing, Defendants have established probable cause existed to search Plaintiff's vehicle and Plaintiff's vehicle could be searched pursuant to the inventory search exception.  Thus, Plaintiff has failed to show any dispute of material fact indicating the search of his vehicle violated his constitutional rights.  Accordingly, I **RECOMMEND** the Court **GRANT** Defendants' Motion for Summary Judgment on Plaintiff's Fourth Amendment claim related to the search and seizure of his vehicle against Defendant Sullivan.

## III.    First Amendment Retaliation Claim Against Defendant Watson

In his Complaint, Plaintiff alleges Defendant Watson placed him on lockdown for grieving the loss of his arm sling, in violation of his First Amendment rights.  Doc. 1 at 7.  Defendant Watson argues he is entitled to summary judgment on Plaintiff's retaliation claim because he placed Plaintiff on lockdown for disciplinary issues unrelated to his filing grievances.  Doc. 52-2 at 21.  That is, Defendant Watson asserts he did not violate Plaintiff's constitutional rights.  Plaintiff acknowledges he was punished for these other disciplinary issues and does not provide any support for his claim his placement in lockdown was due to his filing of grievances.  Doc. 65 at 2.

It is well-settled that "[p]rison officials may not retaliate against inmates for filing lawsuits or administrative grievances."  Smith v. Fla. Dep't of Corr., 318 F. App'x 726, 728 (11th Cir. 2008).  Such retaliation implicates both an inmate's right of access to courts and an inmate's First Amendment freedom of speech.  Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989).  Retaliation, in and of itself, is a constitutional violation.  Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989).  To successfully state a retaliation claim, a plaintiff must allege three elements: (1) his speech was constitutionally protected; (2) the defendant's retaliation adversely affected the protected speech; and (3) a causal connection between the retaliation and the adverse effect on the speech.  Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008).

Because Plaintiff has presented no evidence beyond the unsupported allegations in his pleadings Defendant Watson did in fact retaliate against him for his grievances in any way, Defendant Watson is entitled to summary judgment.  Defendant Watson provided sworn a declaration stating he did not retaliate against Plaintiff by placing him on lockdown and Plaintiff's disciplinary reports reflect the same.  Doc. 52-1 at 10; Doc. 52-4 at 4; Doc. 52-14 at 1; Doc. 65 at 2.  Instead, the undisputed material facts show Plaintiff was punished for profanity and disrespect, abusing and disrupting services, making threats, and disorderly conduct, but Plaintiff was not punished for anything related to filing grievances.  Doc. 52-1 at 11; Doc. 52-4 at 4; Doc. 52-18 at 2; Doc. 65 at 2.  Plaintiff has not produced any evidence to contradict these declarations.  In fact, in Plaintiff's affidavit he admits Defendant Watson placed him on lockdown because Defendant Watson perceived Plaintiff to be threatening him.  Doc. 65 at 2 ("Watson felt when I mentioned that I have yet to begin to act like an a** but I will, he took it as a threat[,] responding by placing me on Lockdown . . . .").  Moreover, Plaintiff cannot rest on the

allegations in his pleadings for purposes of summary judgment.  Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324 ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").

Thus, the undisputed facts show Defendant Watson did not retaliate against Plaintiff for filing grievances, and Defendant Watson is entitled to summary judgment, as he did not violate Plaintiff's First Amendment rights.  Accordingly, I **RECOMMEND** the Court **GRANT** Defendants Sullivan and Watson's Motion for Summary Judgment related to Plaintiff's First Amendment claims against Defendant Watson.[8]  Doc. 52.

**IV.    Deliberate Indifference Claims Against Defendant Osborne**

Plaintiff alleged in his Complaint Defendant Osborne was deliberately indifferent to Plaintiff's physical injuries, including a broken collarbone and shoulder blade, when she confiscated Plaintiff's arm sling and refused to provide him with prescription medication.  Doc. 1 at 5, 7.  Plaintiff claims Defendant Osborne's confiscation of his arm sling has caused his left pectoral to remain permanently swollen.  Id. at 7.  Defendant Osborne argues she is entitled to summary judgment because she did not confiscate his arm sling and provided Plaintiff with the care she is permitted to by law, including referring him to a qualified medical provider; thus, she was not deliberately indifferent to Plaintiff's serious medical needs.  Doc. 55.  However, Plaintiff again opposes summary judgment, suggesting there is a dispute of material fact as to whether Defendant Osborne confiscated his arm sling, precluding summary judgment.  Doc. 65-1 at 2–3.

---

[8]    Defendant Watson also addresses a potential Fourteenth Amendment Due Process claim by Plaintiff.  However, Plaintiff was not permitted to move forward with a Fourteenth Amendment claim after frivolity review.  Docs. 18, 30.  Further, Plaintiff did not attempt to assert a Fourteenth Amendment claim in his Complaint or in his Objections to the Report and Recommendation.  Docs. 1, 27. Accordingly, the Court declines to address summary judgment on any Fourteenth Amendment claims because no such claim is pending in this case.

A.    **Legal Standard**

A pre-trial detainee's right to adequate medical care arises under the due process clause of the Fourteenth Amendment.  Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015).  However, the Eleventh Circuit has "historically treated convicted prisoners' Eighth Amendment claims and pretrial detainees' Fourteenth Amendment claims identically."  White v. Cochran, Civ. No. 16-17490-G, 2017 WL 6492004, at *2 (11th Cir. Nov. 27, 2017).  Thus, a deliberate indifference to medical needs claim under the Fourteenth Amendment mirrors analysis of the Eighth Amendment's proscription against cruel and unusual punishment.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).

"The Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'"  Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)).  To prove a deliberate indifference to medical treatment claim, a plaintiff must demonstrate: (1) a serious medical need; (2) deliberate indifference to the need; and (3) a causal connection between the constitutional violation and plaintiff's injury.  Id.  The first element is an objective inquiry.  Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).  A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Id. (quotation and citation omitted).

The second element is a subjective inquiry.  Id.  To show defendants' deliberate indifference, a plaintiff must prove: "(1) subjective knowledge of a risk of serious harm; (2) a disregard of that risk; (3) by conduct that is more than mere negligence."  Melton, 841 F.3d at 1223.  Conduct that is more than mere negligence can include grossly inadequate care, a decision

31

to take a less effective but easier course of treatment, or completely cursory medical care that amounts to no treatment at all.  Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011).  However, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment does not support a claim of deliberate indifference."  Melton, 841 F.3d at 1224 (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).  Accordingly, a mere medical malpractice claim does not amount to a constitutional violation.  Estelle, 429 U.S. at 104.

**B.     Analysis of Plaintiff's Fourteenth Amendment Claims**

Defendant Osborne argues Plaintiff's claims she removed and deprived him of his arm sling and withheld proper medication while he was detained are unsupported by the record and she should be granted summary judgment.  Doc. 55 at 1; Doc. 69.  Defendant Osborne concedes Plaintiff's injuries, a broken left collar bone, broken left shoulder blade, and multiple left rib fractures, constitute a serious medical need.  Doc. 55 at 6.  However, according to Defendant Osborne, Plaintiff cannot show she had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence, as is required to prove a deliberate indifference claim.  Id.  That is, Defendant Osborne argues, on the single occasion she saw Plaintiff—the May 7, 2017 Health Appraisal—she treated Plaintiff appropriately and Plaintiff cannot establish a causal link between Defendant Osborne's actions and Plaintiff's alleged injury.  Id. at 7.

Plaintiff opposes Defendant Osborne's Motion for Summary Judgment.  Doc. 65-1 at 2.  Plaintiff states he entered Camden County Detention Center with a sling, which was removed by Defendant Osborne for malicious reasons.  Id. at 3.  Further, Plaintiff argues he signed the necessary releases so Defendant Osborne should have been able to provide him with his

prescription medication.  Id.  Additionally, Plaintiff contends his child's mother provided Nurse Mike, a non-party, with his medical records including his prescriptions, yet he was still not provided these medications.  Id.

Here, there is a genuine dispute of fact as to whether Defendant Osborne confiscated Plaintiff's arm sling.  Defendant Osborne claims she never saw Plaintiff with an arm sling and would not have confiscated one given his injuries.  Doc. 55-1 at 2; Doc. 55-4 at 2.  Plaintiff, on the other hand, swears under penalty of perjury he entered Camden County Detention Center with an arm sling and Defendant Osborne ordered it to be confiscated.  Doc. 65 at 1. Specifically, Plaintiff contends on May 8, 2017, an unknown officer confiscated his sling at direction of Defendant Osborne, as Defendant Osborne was worried Plaintiff would harm himself with the sling.  Doc. 65 at 1; Doc. 52-19 at 9–10.  However, another correctional officer returned his sling the next day, on May 9, 2017.  Doc. 52-19 at 9–10.

Even assuming for the purposes of summary judgment Defendant Osborne confiscated Plaintiff's sling on May 8, 2017, she is still entitled to summary judgment.  Defendant Osborne purportedly confiscated Plaintiff's sling on May 8, 2017, out of concerns for him potentially harming himself with metal on the sling.  Doc. 65 at 1.  There is no indication she was disregarding some risk of serious harm in doing so; in fact, assuming Plaintiff's allegations to be true, Defendant Osborne alleged confiscation of the sling was intended to avoid a risk of serious harm, namely suicide.

Plaintiff's claim Defendant Osborne did not provide prescription medication also does not constitute deliberate indifference.  It is undisputed Defendant Osborne is not legally permitted to provide Plaintiff with such medication and took appropriate action to treat his condition by referring him to a qualified healthcare provider who could assess his injuries and

provide him his prescription medication.  Doc. 52-21 at 3–4; Doc. 55-1 at 3; Doc. 55-3 at 5;

Doc. 55-4 at 3.  That is, Defendant Osborne's referral to a qualified healthcare provider on May

7, 2017, confiscation of the sling due to concerns over Plaintiff harming himself on May 8, 2017,

and placement in a medical holding cell are treatment choices, which do not amount to deliberate

indifference.  This is especially true given the circumstances of Defendant Osborne's treatment

of Plaintiff—she saw Plaintiff for treatment only once on May 7, 2017, to perform his Health

Appraisal as part of intake and did not provide him with ongoing treatment.

 Put differently, even if proper treatment called for Defendant Osborne to allow Plaintiff

to keep his arm sling and ensure he received his prescription medications, her decision to

confiscate Plaintiff's sling because of other medical concerns, refer Plaintiff to a qualified

healthcare provider to receive medications and other treatment, and place him in a medical

holding cell demonstrates Defendant Osborne was not deliberately indifferent.  At most, the

conduct could have been considered negligent, but incidents of negligence or medical

malpractice do not rise to the level of a constitutional violation.  Harris, 941 F.2d 1495, 1504

(11th Cir. 1991); Estelle, 429 U.S. at 105–06 (Neither "inadvertent failure to provide adequate

medical care" or "negligen[ce] in diagnosing or treating a medical condition" amounts to

deliberate indifference to a serious medical need.).  Where the inmate has received medical

treatment, as is the case here, and the dispute concerns the adequacy of the treatment, courts

should be reluctant to question the accuracy or appropriateness of the medical judgments made.

Harris, 941 F.2d at 1507 (quotations omitted).  Moreover, Plaintiff provides no evidence

Defendant Osborne's decision to confiscate Plaintiff's sling over self-harm concerns, refer him

to a qualified healthcare provider, and place him in a medical holding cell amounts to negligent

or more than negligent conduct.  Finally, even assuming for purposes of this Motion Plaintiff's

pectoral remains "permanently swollen" (Plaintiff's only claimed injury), there is no evidence demonstrating this purported injury is any way connected to Defendant Osborne confiscating Plaintiff's arm sling.

Accordingly, assessing the record in the light most favorable to Plaintiff, as the Court is required, Plaintiff has failed to establish a claim for deliberate indifference against Defendant Osborne.  Because the evidence does not establish a constitutional violation, I **RECOMMEND** the Court **GRANT** Defendant Osborne's Motion for Summary Judgment.  Doc. 55.

## V.    Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.  Though Plaintiff has not yet filed a notice of appeal, it is proper to address these issues now.  See Fed. R. App. P. 24(a)(3) (trial court may certify appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).  Thus, a claim is frivolous and not brought in good faith if it is "'without arguable merit either in law or fact.'"  Moore v. Bargstedt, 203 F. App'x 321, 323 (11th Cir. 2006) (quoting Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir. 2001));

see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's claims and Defendants' Motions for Summary Judgment, there are no non-frivolous issues to raise on appeal, and an appeal on these claims would not be taken in good faith.  Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

Because Plaintiff has not presented a genuine issue of material fact, I **RECOMMEND** the Court **GRANT** Defendants' Motions for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff in forma pauperis status on appeal.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.  Objections shall be specific and in writing.  Any objection that the Magistrate Judge failed to address a contention raised in the Complaint must be included.  Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.  28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).  To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.  Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1.  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO REPORTED and RECOMMENDED**, this 4th day of August, 2021.


BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA